UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA,

                    Plaintiff,                           <u>DECISION & ORDER</u> and
                                                         <u>REPORT & RECOMMENDATION</u>

          v.                                             11-CR-6083CJS

ROBERT W. MORAN, JR.,

                    Defendant.

_____


<u>PRELIMINARY STATEMENT</u>

          By Order of Hon. Charles J. Siragusa, United States District Judge, dated May 2,

2011, all pretrial matters in the above captioned case have been referred to this Court pursuant to

28 U.S.C. §§ 636(b)(1)(A)-(B).  (Docket # 2).

          Defendant Robert Moran ("Moran") has been charged in two counts of a

seven-count superseding indictment returned against him and co-defendants James Henry

McAuley, Jr. ("McAuley"), Donna Boon ("Boon"), Gina Tata ("Tata"), Richard E. Riedman

("Riedman"), Timothy M. Stone ("Stone"), Richard W. Mar ("Mar"), Gordon L. Montgomery

("Montgomery"), Jeffrey A. Tyler ("Tyler") and Paul S. Griffin[1] ("Griffin").  (Docket # 126).

The third count of the superseding indictment charges McAuley, Moran and Tata with assault

with a dangerous weapon in aid of racketeering activity, in violation of the violent crimes in aid

_____

          [1] Griffin pled guilty to the charge against him and was sentenced on March 25, 2013.  (Docket # 392).

of racketeering statute ("VICAR"), 18 U.S.C. § 1959(a)(3) and 18 U.S.C. § 2.[2]  (*Id.* at 6, ¶ 8).

The fourth count of the superseding indictment charges Moran and Tata with conspiracy to

commit the VICAR assault, in violation of 18 U.S.C. § 1959(a)(6).  (*Id.* at 7-8, ¶¶ 1-3).

      The charges against Moran arise from an assault that occurred on May 31, 2006,

and its alleged relationship to the Hell's Angels Motorcycle Club, Rochester Charter ("Hell's

Angels"), a purported enterprise within the meaning of the racketeering statute.  (*Id.* at 3-10).

Specifically, defendants McAuley, Moran, Riedman, Stone and Tata are alleged to have been

members of or associated with the Hell's Angels.  (*Id.* at 3-4, ¶¶ 1-4).  Among other things, the

superseding indictment alleges that on May 31, 2006, Moran assaulted a patron of Spenders Bar

in Rochester, New York by beating him with a baseball bat, aided and abetted by McAuley and

Tata.  (*Id*. at 7-8, ¶¶ 2-3).  The indictment further alleges that the Hell's Angels engaged in

racketeering activities – namely, unspecified narcotics trafficking and acts involving murder.  (*Id.*

at 6, ¶ 7).

      Currently pending before this Court is Moran's motion for a bill of particulars.

(Docket # 257-1 at ¶¶ 17-22).  Before the Court for Report and Recommendation are Moran's

motions to suppress tangible evidence and for a hearing pursuant to *Franks v. Delaware*, 438

U.S. 154 (1978).[3]  (*Id.* at ¶¶ 23, 33-63).  For the reasons discussed below, I deny Moran's request

---

[2]  A full recitation of the charges in the superseding indictment may be found in this Court's Report and Recommendation dated November 26, 2013.  (Docket # 441).

[3]  Moran's original omnibus motion sought, *inter alia*, discovery and inspection, a bill of particulars, *Brady* material, a Rule 12(b)(4) notice, *Jencks* material, Rules 404(b) and 609 materials, suppression of identification testimony, joinder in co-defendants' motions, and leave to file additional motions.  (Docket # 52).  Each of these requests were addressed by the Court either in open court, by written order or by a written report and recommendation.  (Docket ## 74, 76, 115, 118).

    On June 22, 2012, Moran filed an additional motion claiming misjoinder and/or seeking severance.

for a bill of particulars and recommend that the district court deny Moran's motions for a *Franks* hearing and to suppress tangible evidence on the basis that the search warrant was invalid.  I reserve on Moran's motion to suppress tangible evidence on the basis that the execution of the search warrant was unlawful and direct the parties to submit further briefing as set forth herein.

## FACTUAL BACKGROUND

I.    **Search Warrants for 7 and 10 Algonquin Terrace**

On January 14, 2008, this Court issued warrants to search 7 and 10 Algonquin Terrace, Rochester, New York (the "7 and 10 Algonquin Terrace warrants").  Michael J. Preisser ("Preisser"), an agent employed by the Federal Bureau of Investigation ("FBI"), submitted an affidavit in support of his application for the warrants.  ("Preisser Aff. 1").  According to Preisser, he had been investigating the Hell's Angels since early 2006.  (*Id.* at ¶ 5).  Based upon that investigation, he concluded that the premises located at 10 Algonquin Terrace was the Hell's Angels clubhouse.  (*Id.* at ¶ 8(a)).  In addition, he concluded that the premises located at 7 Algonquin Terrace was owned by the president of the Hell's Angels.  (*Id.* at ¶ 8(b)).

In that affidavit, Preisser detailed information he had learned from two confidential witness (referred to as "CW-1" and "CW-2").  (*Id.* at ¶¶ 10-18, 26, 39-41, 43, 51-59, 67-76).  According to Preisser, CW-1 had been cooperating with the FBI since approximately March 2005 in exchange for monetary compensation, totaling more than $82,000.  (*Id.* at ¶ 11).

---

(Docket # 211).  On November 26, 2013, this Court recommended that the district court deny Moran's motion claiming misjoinder or seeking severance.  (Docket # 441).

On August 22, 2012, Moran filed a supplemental motion seeking suppression of tangible evidence, a *Franks* hearing and renewing his request for a bill of particulars.  (Docket # 257).  Those issues are addressed herein.

In addition, CW-1 had been placed in the Witness Security Program.  (*Id.*).  In the affidavit,

Preisser outlined CW-1's criminal history, as well as his[4] association with the Hell's Angels and

its members.  (*Id.* at ¶¶ 12-14).

        According to Preisser, information provided by CW-1 had led to the apprehension

of an individual wanted by the FBI.  (*Id.* at ¶ 11 & n.3).  In addition, information provided by

CW-1 had led to the conviction of two Hell's Angels members, one of whom was CW-2.  (*Id.* at

¶ 11 & n.4).  Preisser stated that the conviction involved VICAR murder conspiracy charges

arising from a plan to shoot members of a rival motorcycle club at a bar located in Fulton, New

York in August 2005.  (*Id.*).[5]

        Preisser affirmed that CW-1, despite initially denying any involvement in the May

31, 2006 assault at Spenders Bar, eventually admitted that he had participated in the assault.  (*Id.*

at ¶ 11 & n.2).  According to Preisser, CW-1 also implicated Moran in the assault.  (*Id.*).  CW-1

reported that on May 31, 2006, he received a telephone call from McAuley about comments

made by a patron at Spenders Bar.  (*Id.* at ¶ 67).  After receiving the phone call, CW-1 went to

Moran's residence at 15 Algonquin Terrace, in accordance with McAuley's instructions.  (*Id.* at

¶¶ 67-68).  CW-1 stated that after he relayed the information, he and Moran left the residence and

approached Moran's 1995 Dodge pickup truck.  (*Id.* at ¶ 68).

        Before entering the truck, Moran told a group of bystanders, in sum and

substance, "now you see what happens when you [*expletive*] with the Angels."  (*Id.*).  According

---

[4]  The record suggests that CW-1 is male and therefore masculine pronouns will be used to refer to CW-1.

[5]  The facts and circumstances relating to CW-1's cooperation in connection with this incident may be found in this Court's Report and Recommendation dated January 17, 2014.  (Docket # 462).

to CW-1, he and Moran then traveled in Moran's 1995 Dodge pickup truck to Spenders Bar, where they participated in an assault.  (*Id.* at ¶¶ 68-69).  According to CW-1, Moran assaulted a patron of the bar using a baseball bat.  (*Id.*).  CW-1 further stated that after the incident, he and Moran returned in the pickup truck to Algonquin Terrace.  (*Id.* at ¶ 71).

According to Preisser's affidavit, Rochester Police Department ("RPD") Officer J. LaFave ("LaFave") observed CW-1 and Moran in a 1995 Dodge truck as he traveled to Spenders Bar in response to the police dispatch about the attack.  (*Id.* at ¶ 72).  LaFave believed that the truck and its occupants matched the description of the suspected perpetrators of the assault at Spenders Bar, so he followed the truck to Algonquin Terrace.  (*Id.*).  He observed the passenger exit the vehicle and enter 14 Algonquin Terrace.  He also observed the driver of the vehicle exit the vehicle and enter 15 Algonquin Terrace.  (*Id.*).  Shortly thereafter, RPD Officer Daniel Nowack ("Nowack") arrived at Algonquin Terrace.  (*Id.*).  When he arrived, Nowack observed Moran exit 15 Algonquin Terrace, and Nowak requested that CW-1 exit 14 Algonquin Terrace.  (*Id.*).  At that point, Moran and CW-1 were transported to Spenders Bar for a show-up identification procedure.  (*Id.* at ¶ 74).

According to Preisser, in addition to the victim of the assault (hereinafter "Witness A"), there were approximately four other potential witnesses to the assault.  (*Id.* at ¶¶ 66, 69, 74).  These witnesses included Tata, two unidentified individuals (hereafter "Witness B" and "Witness C") and the victim's wife (hereafter "Witness E"), who was waiting in a car outside of the bar at the time the assault occurred.  (*Id.*).  During the identification procedure, Witness B, Witness C and Witness E failed to identify either Moran or CW-1 as the perpetrators of the assault.  (*Id.* at ¶ 74).  Witness E stated that CW-1 and Moran were not the same men

whom she had observed entering Spenders Bar before the attack.  (*Id.*).  She later stated that

Moran's pickup truck was not the same pickup truck that she had observed at Spenders Bar prior

to the attack.  (*Id.* at ¶ 79).

Preisser stated that Witness B reported that during the attack Tata and Witness C

took him[6] to the kitchen, advised him that the perpetrators of the attack belonged to a motorcycle

gang and that the assault was retribution for statements that Witness A had made about the

motorcycle gang.  (*Id.* at ¶ 70).  Later, Tata and Witness C advised Witness B not to provide the

police with accurate descriptions of the perpetrators.  (*Id.*).  According to Preisser, Witness B

believed that Tata and Witness C knew Moran and CW-1 prior to the attack.  (*Id.*).

According to Preisser, CW-1 reported that during the early hours of the following

morning CW-1 met with Moran, Riedman and Stone at 10 Algonquin Terrace.  (*Id.* at ¶ 75).

During that meeting, Moran instructed Stone to retrieve a baseball bat from his pickup truck and

to "get rid of it."  (*Id.*).  CW-1 stated that he observed Stone leave and return with a baseball bat

that appeared to have blood on it.  (*Id.*).  According to CW-1, he and Stone broke the bat using a

sledgehammer and then burned the pieces.  (*Id.*).

On June 7, 2006, an RPD officer conducted two photographic identification

procedures with Witness A.  (*Id.* at ¶ 79).  According to Preisser, the officer showed Witness A

two photographic arrays, one that included a photograph of Moran and one that contained a

photograph of CW-1.  (*Id.*).  Witness A did not identify either Moran or CW-1.  (*Id.*).

---

[6]  The record suggests that Witness B is male and therefore masculine pronouns will be used to refer to
Witness B.

6

On May 18, 2007, an FBI agent conducted two photographic identification procedures with Witness B.  (*Id.* at ¶ 80).  According to Preisser, the agent displayed two photographic arrays, one containing a picture of Moran and the other containing a picture of CW-1.  (*Id.*).  Witness B identified Moran and CW-1 as the perpetrators of the assault at Spenders Bar.  (*Id.*).

Preisser's affidavit also provided information regarding the Hell's Angels, including information relating to its organizational structure and members.  (*Id.* at ¶¶ 19-34).  Preisser's affidavit also described the types of records he believed were maintained by the Hell's Angels and its members.  (*Id.* at ¶¶ 35-45).

## II.   Search Warrant for 1995 Dodge Pickup

Several months later, on March 27, 2008, this Court issued a warrant to search a 1995 Dodge Ram 2500 pickup truck (the "truck warrant").  Preisser submitted an affidavit in support of his application for the truck warrant.  ("Preisser Aff. 2").  That affidavit incorporated by reference his previous affidavit in support of his application for the 7 and 10 Algonquin Terrace warrants.  (*Id.* at ¶ 6).  According to Preisser, his investigation led him to believe that until approximately January 18, 2008, Moran frequently utilized the 1995 Dodge truck (the "Dodge truck").  (*Id.* at ¶ 9).  Observations made during subsequent physical surveillance in March 2008 suggested that Moran began driving a new truck, although the Dodge truck remained registered to Moran's wife and was located by law enforcement parked in the vicinity of Moran's former employment.  (*Id.* at ¶¶ 9-11).  Preisser affirmed that his investigation led him to conclude

that Moran and CW-1 used the Dodge truck to travel to and from Spenders Bar on the night of

the alleged assault.  (*Id.* at ¶ 14).

On the way to Spenders Bar, Moran

concealed the baseball bat, which was later used to commit the assault, under the driver's seat of

the Dodge truck and likely placed the bat in the same location immediately after the assault.  (*Id.*

at ¶¶ 14-15).  Further, Preisser stated that later that evening CW-1 witnessed Moran instruct

Stone to retrieve that bat from the Dodge truck.  (*Id.* at ¶ 15).  According to CW-1, Stone left and

returned with the baseball bat, which appeared to have blood on it.  (*Id.*).

Preisser's affidavit also stated that Timothy Crino ("Crino"), an agent employed

by the FBI with experience in the collection of DNA evidence, believed that there was a strong

likelihood that blood evidence relating to the assault would be detected in the Dodge truck based

upon the information Preisser had gathered during his investigation, including CW-1's

statements regarding his observations of the baseball bat.  (*Id.* at ¶¶ 16-20).


## III.   Search Warrant for 15 Algonquin Terrace

On April 28, 2011, this Court issued a warrant to search Moran's residence, 15

Algonquin Terrace, Rochester, New York (the "15 Algonquin Terrace warrant").  The warrant

authorized the seizure of "[a]ll items of personal property bearing symbols, words, or imagery

relating to the [Hell's Angels], including plaques, vests, colors, patches, t-shirts, rings, pins, belt

buckles, stickers, and photographs (whether such photographs are stored in documentary or

electronic form), evidencing an association with or membership in the [Hell's Angels]."  (15

Algonquin Terrace warrant at Attachment B).  In addition, the warrant specifically authorized the

search and seizure of any computers found in the premises.  (*Id.*).  The warrant was based upon

an affidavit sworn to by Preisser.  ("Preisser Aff. 3").  The affidavit also incorporated by

reference Preisser's affidavit in support of his application for the 7 and 10 Algonquin Terrace

warrants.  (*Id.* at ¶ 6).

        Preisser's supporting affidavit identified evidence that was seized during the

execution of the search warrants at 7 and 10 Algonquin Terrace.  (*Id.* at ¶¶ 8-11).  According to

Preisser, numerous personal items bearing Hell's Angels symbols or imagery were seized, along

with telephone and membership lists.  (*Id.* at ¶¶ 8-9).  One of the lists, entitled "Hells Angels

Rochester" included an entry for "Bugs" with a birth date of April 5.  (*Id.*).  According to

Preisser, Moran's birth date is April 5, 1952.  (*Id.*).  In addition, a search of a computer seized

from one of the premises contained two digital photographs "depicting the membership" of the

Hell's Angels.  (*Id.* at ¶ 10).  According to Preisser, Moran is depicted in the photographs and is

wearing clothes with Hell's Angels symbols.  (*Id.*).  Preisser also stated that documents reflecting

Hell's Angels rules were also seized from the premises.  (*Id.* at ¶ 11).  The rules stated that only

Hell's Angels members were permitted to wear clothing or accessories with Hell's Angels

symbols and that members were required to keep an inventory of such items.  (*Id.*).

        Preisser's supporting affidavit also included additional information concerning the

assault at Spenders Bar provided by CW-2[7], another confidential witness ("Witness F"), a

civilian witness, and Michael Magri ("Magri"), a RPD Officer who responded to Algonquin

Terrace on the evening of the assault.  (*Id.* at ¶¶ 13-20, 23).  According to Preisser, Witness F

---

[7] Preisser's affidavit noted that CW-2 received a sentence of 70 months on his conviction in the Northern District of New York.  (*Id.* at ¶ 8 n.3).  According to Preisser, CW-2 received credit for cooperation in this case. (*Id.*).

stated that he[8] was with Stone, a Hell's Angels associate on the evening of the assault at Spenders

Bar.  (*Id.* at ¶ 13).  Witness F stated that he overheard a conversation in which Moran was

implicated in an assault of a person with a baseball bat.  (*Id.*).  Witness F also stated that he

informed Moran and CW-1 that Spenders Bar had surveillance cameras.  (*Id.*).  Later that night,

according to Witness F, he observed Stone attempting to destroy a baseball bat and also heard

that Stone and CW-1 had obtained the surveillance footage from Spenders Bar.  (*Id.*).

      According to Preisser, a civilian witness observed an individual named "Bob" on

Algonquin Terrace on the evening of May 31, 2006.  (*Id.* at ¶ 16).  At the time, the witness was

on his porch smoking marijuana.  (*Id.*).  The witness overheard Moran threaten to assault

someone and then saw him leave Algonquin Terrace in a pickup truck.  (*Id.*).  The witness later

observed "Bob" return to Algonquin Terrace in the same truck, exit the vehicle and run to his

house.  (*Id.* at ¶ 17).  The witness stated that he knew that "Bob" lived at 15 Algonquin Terrace.

(*Id.* at ¶ 15).

      Preisser's affidavit stated that CW-2 provided additional information relating to

the Hell's Angels and the alleged assault.  (*Id.* at ¶ 19).  CW-2 reported that he[9] had overheard

Moran and Riedman discussing the assault at Spenders Bar.  (*Id.*).  According to CW-2, in

response to a comment by Moran regarding the surveillance recordings at Spenders Bar,

Riedman stated that the surveillance film had been removed from the bar.  (*Id.*).  In addition,

---

    [8]  The record suggests that Witness F is male and therefore masculine pronouns will be used to refer to
Witness F.

    [9]  The record suggests that CW-2 is male and therefore masculine pronouns will be used to refer to CW-2.

CW-2 stated that CW-1 had told him that CW-1 had been picked up by law enforcement, but that "they didn't get the assault weapon." (*Id.* at ¶ 19).

According to Preisser, Officer Magri responded to Algonquin Terrace on the evening of May 31, 2006. (*Id.* at ¶ 23). Magri reported that he detained Moran and transported him to Spenders Bar for a show-up identification procedure. (*Id.*). Before leaving for the bar, Moran asked Magri if he could remove and secure his belt buckle. (*Id.*). According to Magri, Moran told him that he received the belt buckle after having been a Hell's Angels member for ten years. (*Id.*). Magri escorted Moran to 15 Algonquin Terrace and permitted Moran to remove the belt buckle and place it in the mail slot in the door. (*Id.*).

Preisser also recounted the contents of a conversation between McAuley and Riedman that was recorded while McAuley was incarcerated at the Onondaga County Jail. (*Id.* at ¶ 21). According to Preisser, during the conversation, McAuley told Riedman that CW-1 was an FBI informant and that CW-1 was wearing a recording device during his dealings with the Hell's Angels. (*Id.* at ¶ 22). In addition, according to Preisser, McAuley indicated that anyone who dealt with CW-1 could be at risk for criminal charges and specifically referenced "fifteen," which Preisser interpreted to refer to Moran, who resided at 15 Algonquin Terrace. (*Id.*). Preisser stated that McAuley also referenced Stone taking a computer apart and the events that "preceded" Stone's actions, which Preisser interpreted to refer to the Spenders Bar assault and Stone's subsequent retrieval of the surveillance footage. (*Id.*).

In addition, Preisser's affidavit also recounted information learned during his investigation about Moran's possession of Hell's Angels-related paraphernalia. (*Id.* at ¶¶ 24-26). According to Preisser, Hell's Angels members typically keep personal items containing Hell's

Angels symbols at their residence. (*Id.*). Preisser stated that CW-2 reported that Moran had

Hell's Angels-related rings, pins, patches, t-shirts and a belt buckle. (*Id.*). In addition, CW-2

reported that Hell's Angels members were required to keep their Hell's Angels-related items

either on their person, at the clubhouse or in their residence. (*Id.*). According to Preisser, Moran

was observed on April 17, 2011, by members of law enforcement conducting physical

surveillance. (*Id.* at ¶ 25). At the time, Moran was wearing a black leather jacket containing

Hell's Angels-related patches. (*Id.*).

Finally, his affidavit explained the need to seize an entire computer or other

electronic items in order to fully recover potential evidence contained on such items. (*Id.* at

¶¶ 28-37). Based upon this explanation, Preisser sought authorization to remove any computers

or computer-related items from 15 Algonquin Terrace so that those items could be examined by

law enforcement personnel with the experience and technical skills required to remove relevant

information. (*Id.*).

## IV.   **Execution of Search Warrant at 15 Algonquin Terrace**

This Court conducted an evidentiary hearing on October 24, 2012 concerning the

circumstances surrounding the execution of the search warrant at 15 Algonquin Terrace on April

29, 2011. (Docket # 307).[10]  During the hearing, the government offered testimony from FBI

Special Agent David Knight ("Knight") and New York State Police Investigator Daniel J.

Risewick ("Risewick"). (Tr. 10, 76).

---

[10]  The transcript of the October 24, 2012 hearing shall be referred to as "Tr. __." (Docket # 319).

A.    **Testimony of Knight**

Knight testified that he had been employed as an agent with the FBI for approximately five years.  (Tr. 11).  On April 29, 2011, Knight was assigned to assist in the execution of an arrest warrant for Moran and to lead the search team in the execution of the search warrant for Moran's residence at 15 Algonquin Terrace, Rochester, New York.  (Tr. 11-12).  Knight, along with approximately twenty other law enforcement officers comprising a SWAT team, an arrest team and a search team, arrived at the premises at approximately 6:00 a.m.  (Tr. 15, 42).

According to Knight, he and other law enforcement members approached and knocked on the front door.  (Tr. 15).  Knight testified that a woman answered the door accompanied by a dog.  (*Id.*).  Members of the SWAT team removed the woman and dog from the residence, and Knight called for Moran.  (Tr. 15-16).  Moran came downstairs from the second floor and exited the residence in accordance with Knight's instructions.  (Tr. 16).  At that time, Knight handcuffed Moran and led him to a police vehicle.  (*Id.*).

Before placing Moran in the vehicle, Knight searched Moran and discovered a "drug paraphernalia pipe" and a bag containing approximately six grams of a substance that Knight believed to be marijuana.  (Tr. 16-18, 47).  At that time, either Knight or one of the members of the SWAT team requested that local law enforcement attempt to locate a canine trained to detect narcotics in order to search the residence.  (Tr. 46-47).  Knight explained that it was his usual practice in executing a search warrant to request a drug dog when narcotics were discovered.  (Tr. 47).  Knight testified that use of a drug dog, among other things, permits law enforcement to expedite the search.  (Tr. 61).  In this case, Knight turned over the pipe and the

13

bag to one of the New York State troopers and returned to the residence to assist the SWAT team in conducting a security sweep of the residence.  (Tr. 18-19).

According to Knight, after the sweep was concluded, a member of the SWAT team informed him that firearms had been located in the master bedroom.  (Tr. 48, 64-65). Knight testified that they did not take any immediate actions with respect to the guns at that time. (Tr. 48).  Knight proceeded to brief the search team, which was composed of members of the New York State Police, FBI agents and non-agent FBI support personnel.  (Tr. 12, 19-20). According to Knight, he discussed the scope of the warrant and read *verbatim* the paragraph of the search warrant that described the items to be seized.  (Tr. 19-20, 37-38).  According to Knight, he understood the warrant to authorize the search and seizure of any evidence of Moran's association with the Hell's Angels.  (Tr. 38).  Thus, Knight believed that the items for which they were authorized to search could have been very small and could have been contained in places like jewelry boxes, containers, boxes or drawers.  (Tr. 60).

After the search team was briefed, at approximately 6:45 a.m., a photographer entered the residence in order to take pre-search photographs.  (Tr. 20, 69-71; Defendant's Exhibit ("Def. Ex.") A).  Around that same time, Knight and the SWAT team leader, Chris Fiorito ("Fiorito"), went to the bedroom to disable the firearms identified during the sweep so that they could not be fired.  (Tr. 48, 50-51, 64-65).  According to Knight, he observed three firearms when he entered the master bedroom.  (Tr. 23-26, 64-67).  At approximately 6:50 a.m., a photographer took photographs of the firearms in their original location, and Fiorito then disarmed them by removing any ammunition and using zip-ties through the "ejection ports" and "sliders" to render the weapons inoperable.  (Tr. 26-27, 50-51, 65-66, 69-70).

14

Knight testified that a handgun was located on top of the night stand in the master bedroom of the residence and another handgun was located in the drawer of the same night stand. (Tr. 23-26, 33; Government's Exhibit ("G. Ex.") 4).  When Knight first observed the night stand, the drawer was open, but Knight did not know whether the drawer was open or closed before the SWAT team entered the house.  (Tr. 48).  Knight testified that both hand guns were loaded and were not secured in a locked cabinet, nor were they equipped with a trigger lock.  (Tr. 26; G. Ex. 9).  According to Knight, two marijuana pipes were also discovered in the vicinity of the handguns – one on top of the night stand and the other inside the drawer.  (Tr. 24, 31; G. Ex. 4).

According to Knight, a loaded shotgun was also discovered in the master bedroom.  (Tr. 28, 30-31; G. Ex. 10).  Knight testified that the shotgun was located in a corner behind a door leading into a closet.  (Tr. 28-29, 33; G. Ex. 5).  The shotgun was not secured in a locked cabinet or case and was not equipped with a trigger lock.  (Tr. 29-30).  Knight testified that he subsequently learned that Risewick discovered another firearm in the residence.  (Tr. 35).

After the three firearms in the master bedroom had been rendered safe, while photographs were being taken, a canine trained to detect the presence of explosives was led through the house at approximately 7:18 a.m.  (Tr. 70-73; Def. Ex. A).  Knight did not request or order the explosives canine and did not know why the explosives dog was used in this case.  (Tr. 45-46, 59, 61, 73).  Knight further testified that he had no basis for believing that explosives, other than the firearms and ammunition discussed above, were present in the home.  (Tr. 45-46, 72-73).  Knight later learned that the explosives dog did not alert to anything in the residence. (Tr. 66).

When the photographer was done, at approximately 7:24 a.m., the formal search of the residence commenced.  (Tr. 22, 73).  Approximately twenty-five minutes later, the drug dog arrived at the scene and was led through the house.  (Tr. 73-74; Def. Ex. A).  According to Knight, prior to the arrival of the narcotics canine, the search of the premises had not yielded any narcotics or narcotics-related paraphernalia other than the marijuana pipes discussed above.  (Tr. 74).  Knight was subsequently informed that the drug dog did not alert to anything in the residence.  (Tr. 51-52, 66).

According to Knight, law enforcement found and seized four firearms, ammunition, cell phones, at least one computer and Hell's Angels-related paraphernalia, including photographs and a belt buckle.  (Tr. 23-31, 34-35, 52-53, 57).  Knight testified that the computers were turned over to the Western New York Regional Computer Forensics Laboratory ("WNYRCFL") for examination.  (Tr. 53).  According to Knight, he provided WNYRCFL a copy of the search warrant, including a description of the items to be seized.  (Tr. 59).  In addition, Knight directed them to search for videos, photographs, emails and transcripts of online communications involving Moran and Riedman.  (Tr. 54-56).  According to Knight, he believed that the warrant authorized a search for anything related to the Hell's Angels, including documents, communications and emails, and because he believed that Moran and Riedman were associated with the Hell's Angels, he provided their names as potential search terms.  (Tr. 55, 58-59).

Knight testified that prior to the search of Moran's home, he knew that the execution of search warrants at 7 and 10 Algonquin Terrace had yielded documents and items connecting Moran to the Hell's Angels and that there was "no doubt in his mind" that Moran was

a member or associate of the Hell's Angels.  (Tr. 38-41).  In addition, prior to the 15 Algonquin

Terrace warrant's execution, he was unaware of the existence of a City of Rochester ordinance

relating to the care, maintenance and storage of firearms.  (Tr. 56-57).

> **B.**     **Testimony of Risewick**

Risewick testified that he had been employed by the New York State Police for

approximately twenty-five years and had been an investigator for approximately fourteen years.

(Tr. 76-77).  On April 29, 2011, Risewick was assigned to assist the search team in the execution

of the search warrant for 15 Algonquin Terrace.  (Tr. 77-78).

Risewick was responsible for searching a room located on the second floor of the

residence next to the bathroom.  (Tr. 78, 80; G. Ex. 8).  According to Risewick, he searched the

room and then searched the closet.  (*Id.*).  In the closet, he found a canvas gun carrying case

leaning against one of the walls.  (Tr. 78-79).  Risewick opened the case and examined its

contents.  (*Id.*).  Inside, he discovered a shotgun and shotgun shells.  (Tr. 78-80; G. Ex. 7).

## DECISION & ORDER

### Bill of Particulars

I turn first to Moran's renewed motion for a bill of particulars.  (Docket ## 52 at

¶¶ 15-18; 257 at ¶¶ 17-22).  Moran seeks additional particularization regarding the racketeering

activities in which the Hell's Angels enterprise is alleged to have engaged.  (Docket # 52 at ¶ 17).

According to Moran, although the superseding indictment alleges that the racketeering activity

included narcotics trafficking and murder, it does not provide sufficient detail to permit Moran to

defend against the charges.  (Docket # 257 at ¶ 21).  Moran contends that the voluntary discovery

provided by the government to date, which includes Preisser's affidavits in support of the wiretap applications and his affidavits in support of the search warrants for 7, 10 and 15 Algonquin Terrace, fails to elucidate the nature of the racketeering activities at issue.  (*Id.* at ¶¶ 11, 14-15, 20-21).

The government opposes the motion on the grounds that Moran has sufficient knowledge and understanding of the charges, as well as access to substantial voluntary discovery, to make his request unnecessary.  (Docket # 278 at 2-4).  According to the government, Preisser's affidavit in support of the application for the search warrants for 7 and 10 Algonquin Terrace describes in detail a conspiracy to murder members of the Kingsmen Motorcycle Club in August 2005, which is one of the racketeering activities alleged in the superseding indictment. (*Id.* at 2).  According to the government, the voluntary discovery – including the allegations contained in the search warrant applications for the premises located on Algonquin Terrace, the allegations contained in affidavits in support of various wiretap applications,[11] and the allegations contained in affidavits in support of search warrant applications for other residences, including 3658 Batavia-Elba Townline Road,[12] – provide ample detail of the alleged narcotics trafficking activity.  (*Id.* at 3-4).

The purpose of a bill of particulars is to enable the defendant "to identify with sufficient particularity the nature of the charge pending against him, thereby enabling [the] defendant to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy

---

[11]  The content of these affidavits was described in detail in this Court's Report and Recommendation dated December 12, 2013.  (Docket # 449 at 2-11).

[12]  The content of this affidavit was described in detail in this Court's Report and Recommendation dated December 12, 2013.  (Docket # 449 at 11-13).

should he be prosecuted a second time for the same offense." *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987) (citations omitted) (per curiam).  A bill of particulars is not to be used as a discovery device to obtain "evidentiary detail" about the government's case.  *See, e.g.*, *United States v. Torres*, 901 F.2d 205, 234 (2d Cir.) (citation omitted), *cert. denied*, 498 U.S. 906 (1990), *abrogated on other grounds by United States v. Marcus*, 628 F.3d 36 (2d Cir. 2010).  In other words, a bill of particulars should be granted where the information sought is "necessary" to prepare a defense and to avoid double jeopardy, not where it is merely "useful" to the defense in ascertaining the government's proof.  *See United States v. Henry*, 861 F. Supp. 1190, 1197 (S.D.N.Y. 1994); *see also United States v. Love*, 859 F. Supp. 725, 738 (S.D.N.Y.), *aff'd sub nom. United States v. Roberts*, 41 F.3d 1501 (2d Cir. 1994).  Where the charge against the defendant is broad in scope, a bill of particulars may be more appropriate than where the charged conduct is more narrow.  *See, e.g.*, *United States v. Barnes*, 158 F.3d 662, 666 (2d Cir. 1998) ("a bill of particulars or other adequate disclosure is appropriate where a conspiracy count covers a complex series of events over a number of years, but provides only the bare bones of the charge"); *United States v. Davidoff*, 845 F.2d 1151, 1154-55 (2d Cir. 1988) (district court abused discretion in denying a bill of particulars identifying victims in seven-year racketeering conspiracy; court noted that principles governing bills of particulars "must be applied with some care when the [g]overnment charges criminal offenses under statutes as broad as RICO").

       To warrant a bill of particulars, the indictment's charges against a defendant must be so general that they fail to advise him or her of the specific acts of which they are accused. *See United States v. Torres*, 901 F.2d at 234; *United States v. Henry*, 861 F. Supp. at 1198.  In determining that question, the court may consider whether the information sought by the

19

defendant has been made available in alternative forms, such as in discovery or prior court proceedings. *See United States v. Panza*, 750 F.2d 1141, 1148 (2d Cir. 1984); *United States v. Kelly*, 91 F. Supp. 2d 580, 583-84 (S.D.N.Y. 2000); *United States v. Ahmad*, 992 F. Supp. 682, 684 (S.D.N.Y. 1998); *United States v. Feola*, 651 F. Supp. 1068, 1133 (S.D.N.Y. 1987), *aff'd*, 875 F.2d 857 (2d Cir.), *cert. denied*, 493 U.S. 834 (1989).

In this case, Moran has been provided with voluntary discovery, which the government asserts adequately advises him of the charges against him and the nature of the government's case. I agree. The superseding indictment filed against Moran provides him with sufficient information to understand the charges against him. In addition, the above-referenced warrants and supporting affidavits, along with the other discovery materials provided adequately disclose the government's factual bases for the charges. On this record, I find that Moran has sufficient information to prepare his defense, to avoid unfair surprise and to interpose a claim of double jeopardy, if appropriate. *See United States v. Bortnovsky*, 820 F.2d at 574. Accordingly, Moran's motion for a bill of particulars is denied.

## REPORT & RECOMMENDATION

### I.   Validity of Search Warrant for 15 Algonquin Terrace

Next, I address Moran's challenges to the 15 Algonquin Terrace warrant. (Docket # 257-1 at ¶¶ 33-35, 42-57). First, Moran argues that the search warrant was not supported by probable cause because Preisser knowingly omitted material information from his affidavit in support of the application for the search warrant. (*Id.* at ¶¶ 54-57). Second, Moran argues that the information contained in the search warrant was stale. (*Id.* at ¶¶ 46-50). Finally, Moran

argues that the search warrant lacked probable cause to believe that evidence of a crime or a computer would be found in his residence.  (*Id.* at ¶¶ 46, 52).

### A.      Omissions from Search Warrant

Moran contends that Preisser knowingly or recklessly omitted from his affidavit in support of the 15 Algonquin Terrace warrant the fact that the search of the Dodge truck failed to yield any DNA evidence.  (*Id.* at ¶¶ 54-56).  According to Moran, the application for the truck warrant was primarily based upon information obtained from CW-1, including that Moran placed the bat used in the assault on the floor of the truck after the assault.  (*Id.* at ¶ 55).  Thus, Moran contends the failure to uncover DNA material in the truck demonstrates CW-1's lack of credibility and should have been included in Preisser's affidavit in support of the 15 Algonquin Terrace warrant.  (*Id.* at ¶ 56).  According to Moran, CW-1's information was so critical to Preisser's affidavit in support of the warrant for 15 Algonquin Terrace (as well as the affidavit in support of the 7 and 10 Algonquin Terrace warrants that was incorporated by reference), that – without it – the warrant would have lacked probable cause.  (*Id.*).  Alternatively, Moran argues that he is entitled to a *Franks* hearing in order to determine Preisser's state of mind when he omitted the information.  (*Id.* at ¶ 57).

The government concedes that Preisser was aware that the execution of the truck warrant failed to yield DNA evidence, but contends that this fact was not material to the Court's probable cause determination for the 15 Algonquin Terrace warrant.  (Docket ## 319 at 88; 351 at 17).  First, according to the government, the fact that DNA evidence was not discovered in the truck does not discredit CW-1.  (Docket # 351 at 17).  Even if it did bear on his credibility, the government argues, Preisser's affidavit reveals independent indicia establishing CW-1's

21

reliability, including his historical cooperation with the FBI, his statements against his own interest and the independent investigative corroboration of the information supplied by CW-1. (*Id.* at 17-19).

The Fourth Amendment to the Constitution provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. CONST. amend. IV; *see also* Fed. R. Crim. P. 41. In *Illinois v. Gates*, 462 U.S. 213 (1983), the Supreme Court affirmed the "totality of the circumstances" test to determine whether a search warrant satisfies the Fourth Amendment's probable cause requirement. According to the court, the issuing judicial officer must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. at 238. Ordinarily, a reviewing court's obligation is merely to determine that the issuing judge had a "substantial basis for ... conclud[ing] that probable cause existed." *United States v. Smith*, 9 F.3d 1007, 1012 (2d Cir. 1993) (quoting *Gates*, 462 U.S. at 238-39) (internal quotation omitted); *Walczyk v. Rio*, 496 F.3d 139, 157 (2d Cir. 2007) ("a reviewing court must accord considerable deference to the probable cause determination of the issuing magistrate"). "Nevertheless, little or no deference is due where the government's affidavit misstated or omitted material information about probable cause." *United States v. Rajaratnam*, 2010 WL 4867402, *7 (S.D.N.Y. 2010) (citing *United States v. Canfield*, 212 F.3d 713, 717 (2d Cir. 2000)), *aff'd*, 719 F.3d 139 (2d Cir. 2013).

22

Moran moves the Court for a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), claiming that Preisser intentionally omitted evidence when applying for the search warrant for his residence.  Under the Supreme Court's holding in *Franks v. Delaware*, "a district court may not admit evidence seized pursuant to a warrant if the warrant was based on materially false and misleading information."  *United States v. Levasseur*, 816 F.2d 37, 43 (2d Cir. 1987) (citing *Franks v. Delaware*, 438 U.S. at 154).  To warrant a *Franks* hearing, a defendant challenging an affidavit must make "a substantial preliminary showing that (1) the affidavit contained false statements made knowingly or intentionally, or with reckless disregard for the truth; and (2) the challenged statements or omissions were necessary to the Magistrate's probable cause finding."  *Id.* (citing *Franks*, 438 U.S. at 171-72) (internal quotation omitted).  A hearing is required if the defendant provides the court with a sufficient basis upon which to doubt the truth of the affidavit at issue.  As explained by the Supreme Court:

> To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine.  There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof.  They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons.  Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained.

*Franks*, 438 U.S. at 171.

With respect to the first prong, "[a]llegations of negligence or innocent mistake are insufficient."  *Id.*  Instead, "[t]he focus is not on whether a mistake was made, but rather on the intention behind the mistake."  *United States v. Markey*, 131 F. Supp. 2d 316, 324 (D. Conn.

2001) (citing *Beard v. City of Northglenn, Colo.*, 24 F.3d 110, 116 (10th Cir. 1994)), *aff'd*, 69 F. App'x 492 (2d Cir. 2003).  Thus, pursuant to *Franks*, not all statements in an affidavit have to be true; instead "the statements [must] be 'believed or appropriately accepted by the affiant as true.'"  *See United States v. Campino*, 890 F.2d 588, 592 (2d Cir. 1989) (quoting *Franks*, 438 U.S. at 165), *cert. denied*, 498 U.S. 866 (1990).

With respect to omissions, "the mere intent to exclude information is [likewise] insufficient . . . [because] 'every decision not to include certain information in the affidavit is 'intentional' insofar as it is made knowingly.'"  *United States v. Awadallah*, 349 F.3d 42, 66 (2d Cir. 2003) (quoting *United States v. Colkley*, 899 F.2d 297, 300-01 (4th Cir. 1990)), *cert. denied*, 543 U.S. 1056 (2005).  Accordingly, "[t]o have misled knowingly or recklessly, the government must have done more than make an intentional decision not to include the information, [but] [i]nstead the misleading statement or omission must have been 'designed to mislead' or 'made in reckless disregard of whether [it] would mislead.'"  *United States v. Rajaratnam*, 2010 WL 4867402 at *8 (quoting *United States v. Awadallah*, 349 F.3d at 68).

To determine whether a misstatement in an affidavit is material, the Court must "set[ ] aside the falsehoods in the application, . . . and determine [w]hether the untainted portions [of the application] suffice to support a probable cause . . . finding."  *Rajaratnam*, 719 F.3d at 146 (internal quotations and citations omitted).  When the alleged defect involves an omission, however, "'the literal *Franks* approach [does not] seem[] adequate because, by their nature, omissions cannot be deleted'; therefore '[a] better approach ... would be to ... insert the omitted truths revealed at the suppression hearing.'"  *Id.* (quoting *United States v. Ippolito*, 774 F.2d 1482, 1487 n.1 (9th Cir. 1985)); *see also United States v. Colkley*, 899 F.2d at 301 ("[f]or an

omission to serve as the basis for a hearing under *Franks*, it must be such that its inclusion in the affidavit would defeat probable cause[;] . . . [o]mitted information that is potentially relevant but not dispositive is not enough to warrant a *Franks* hearing").  According to the Second Circuit, "[t]he ultimate inquiry is whether, after putting aside erroneous information and [correcting] material omissions, there remains a residue of independent and lawful information sufficient to support [a finding of] probable cause."  *Rajaratnam*, 719 F.3d at 146 (quoting *United States v. Canfield*, 212 F.3d at 718).

Having reviewed the evidence in the record, I conclude that a *Franks* hearing is not warranted.  Even assuming that Preisser deliberately or recklessly omitted from his affidavit the results of the truck search, I conclude that the withheld information was not material to this Court's probable cause finding.  *See Rajaratnam*, 2010 WL 4867402 at *11 ("a *Franks* hearing is required only if the government's misstatements were necessary to [the issuing judge's] decision to authorize the [warrant] [;] . . . [the inquiry] is, after setting aside the government's misstatements and adding what it omitted from the affidavit, does the Court find that the affidavit set forth minimally adequate facts to establish probable cause").

Although CW-1, as an alleged participant in the assault at Spenders Bar, provided substantial information implicating Moran in the assault, I conclude that there was sufficient independent information recounted in the affidavit that both implicated Moran in the assault and established that he was likely a member of the Hell's Angels to establish probable cause for the warrant, even in the absence of the information provided by CW-1.  Stated another way, even if Preisser had included the results of the execution of the truck warrant in his affidavit in support of the 15 Algonquin Terrace warrant, and even if this Court had concluded that such information

rendered CW-1's information wholly unreliable, sufficient probable cause still existed to justify the issuance of the search warrant.

First, with respect to information implicating Moran in the assault at Spenders Bar, a civilian witness reported that on the evening of the assault he overheard Moran threaten to assault an unidentified individual and observed him leaving Algonquin Terrace in his truck. Officer LaFave, who responded to the dispatch of the assault, observed Moran driving his truck shortly after the assault and followed Moran back to Algonquin Terrace. One of the witnesses (Witness B) to the attack, who did not identify Moran during the show-up identification on the night of the assault, subsequently identified Moran from a photographic array and implicated him in the assault. Further, CW-2 reported that he overheard Moran and Riedman discussing the assault; Witness F reported that he overheard conversations in which Moran was implicated in the assault. Finally, Preisser recounted the contents of a recorded telephone call between McAuley and Riedman which he believed implicated Moran in the assault.

Second, Preisser's affidavit recounted substantial information establishing probable cause to believe both that Moran was a member of the Hell's Angels and that evidence of his membership would be found in his residence. According to Preisser's affidavit, the searches at 7 and 10 Algonquin Terrace yielded telephone and membership lists and photographs establishing Moran's membership in the Hell's Angels. In addition, CW-2 had observed Moran with various Hell's Angels-related personal items and had informed Preisser that the Hell's Angels rules required Moran to keep such items on his person, at his residence or at the clubhouse. Finally, during physical surveillance conducted on April 17, 2011, Moran was observed wearing a jacket with Hell's Angels-related patches.

26

I conclude that even if CW-1's information is entirely disregarded, the allegations outlined above and taken as a whole, implicated Moran in the assault at Spenders Bar and, more importantly, established probable cause to believe that he was a member of the Hell's Angels and that Hell's Angels-related items would be found at his residence.  Accordingly, I conclude that Preisser's omission was not material to the finding of probable cause for the warrant.  *See Rajaratnam*, 719 F.3d at 156-57 & n.20 ("even assuming, *arguendo*, that these alleged misstatements and omissions regarding [the confidential informant] . . . were indeed made with 'reckless disregard for the truth,' we agree with the District Court that they were not 'material'" where the other allegations were sufficient to support finding of probable cause); *United States v. Viers*, 251 F. App'x 381, 383 (9th Cir. 2007) (affirming validity of warrant; "in spite of . . . deliberate or reckless omissions, the informant's tip was not necessary to the finding of probable cause" because probable cause was established on basis of independent investigation), *cert. denied*, 552 U.S. 1275 (2008); *United States v. McGlown*, 200 F. Supp. 2d 1141, 1145-46 (D. Neb. 2002) ("[t]he evidence outlined above demonstrates that even if the confidential source's uncorroborated information is excluded from consideration as unreliable[,] . . . there is simply no indication that the omission of information regarding the confidential source's false statements 'compromised the affidavit to such an extent that it could not have supported a finding of probable cause if [such information] had been included'") (alterations in original) (quoting *United States v. Hall*, 171 F.3d 1133, 1143 (8th Cir. 1999), *cert. denied*, 529 U.S. 1027 (2000)).

For these reasons, I recommend denial of Moran's motion to suppress on the grounds that Preisser knowingly omitted material information from his affidavit.  In arriving at

this recommendation, I make no finding as to whether the omitted information affected the reliability of CW-1's information and, if so, to what extent.

### B.    <u>Staleness</u>

Moran argues that the information contained in Preisser's affidavit was too stale to support a finding of probable cause that evidence of a crime would be found inside 15 Algonquin Terrace.  (Docket # 257-1 at ¶¶ 42-50).  According to Moran, the information in the affidavit relating to the Spenders Bar assault was approximately five years old, and the information obtained from the execution of the search warrants at 7 and 10 Algonquin Terrace was approximately three years old.  (*Id.* at ¶ 44).  According to Moran, the only recent information was the physical surveillance evidence, which merely confirmed information that the government already possessed concerning Moran's membership in the Hell's Angels.  (*Id.* at ¶ 51).

The government maintains that Moran's position mischaracterizes the purpose of the search warrant.  (Docket # 278 at 7).  According to the government, the search warrant sought evidence establishing Moran's connection to or membership in the Hell's Angels, not evidence of the assault that occurred in 2006.  (*Id.*).  The government argues that the information contained in the affidavit established probable cause to believe that evidence of Moran's membership in or association with the Hell's Angels would be found in Moran's residence at the time the search warrant was executed.  (*Id.*).

"In determining whether probable cause exists, the magistrate is required to assess whether the information adduced in the application appears to be current, *i.e.*, true at the time of the application, or whether instead it has become stale."  *Rivera v. United States*, 928 F.2d 592,

602 (2d Cir. 1991).  "The doctrine of staleness applies when information proffered in support of a warrant application is so old that it casts doubt on whether the fruits or evidence of a crime will still be found at a particular location."  *United States v. Lamb*, 945 F. Supp. 441, 459 (N.D.N.Y. 1996).  "While there is no bright line rule for staleness, the facts in an affidavit supporting a search warrant must be sufficiently close in time to the issuance of the warrant and the subsequent search conducted so that probable cause can be said to exist as of the time of the search and not simply as of some time in the past."  *United States v. Wagner*, 989 F.2d 69, 75 (2d Cir. 1993).  Accordingly,  "[t]he information offered in support of the application for a search warrant is not stale if 'there is sufficient basis to believe, based on a continuing pattern or other good reasons, that the items to be seized are still on the premises.'"  *United States v. Lacy*, 119 F.3d 742, 745-46 (9th Cir. 1997) (quoting *United States v. Gann*, 732 F.2d 714, 722 (9th Cir.), *cert. denied*, 469 U.S. 1034 (1984)), *cert. denied*, 523 U.S. 1101 (1998).

"[T]he principal factors in assessing whether or not the supporting facts have become stale are the age of those facts and the nature of the conduct alleged to have violated the law."  *United States v. Diaz*, 176 F.3d 52, 109 (2d Cir.) (internal citations and quotations omitted), *cert. denied*, 528 U.S. 875 (1999); *United States v. Lamb*, 945 F. Supp. at 460.  "Some types of evidence are more likely to remain in one location than other types of evidence."  *United States v. Patt*, 2008 WL 2915433, *12 (W.D.N.Y. 2008).  In addition, "[w]here the criminal activity is suspected to be ongoing, 'the passage of time between the last described act and the presentation of the application becomes less significant.'" *United States v. Gayle*, 2009 WL 4667093, *3 (S.D.N.Y. 2009) (quoting *United States v. Gallo*, 863 F.2d 185, 192 (2d Cir. 1988), *cert. denied*, 489 U.S. 1083 (1989)).  Accordingly, "[t]he age of the information is relevant only

insofar as it affects the likelihood that evidence will be found at the premises." *See United States v. Zoernack*, 2005 WL 1837962, *2 (S.D.N.Y. 2005).

Considering the nature of the evidence sought in this matter – Hell's Angels-related documents and paraphernalia – I find that Preisser's affidavit provided a sufficient basis to believe that evidence of Moran's membership in or association with the Hell's Angels would be found in his residence at the time the warrant was executed. *See id.* ("the nature of the criminal enterprise . . . , together with the kind of evidence to be seized . . . and the nature of the [p]remises . . . , support the conclusions that the items sought were of the type that would be kept over a period of years and that there was a fair probability that they could be found in the [p]remises"); *United States v. LaMorte*, 744 F. Supp. 573, 576 (S.D.N.Y. 1990) (probable cause established where the items to be seized "were not temporary in nature or likely to dissipate over the intervening time"). Preisser's affidavit established that Moran was known to possess multiple items reflecting his membership in or association with the Hell's Angels and that Hell's Angels members were required to keep those items on their person, in the clubhouse or in their residence. Further, less than two weeks before the warrant application, Moran was observed wearing a jacket with Hell's Angels-related patches. I recommend that Moran's motion to suppress due to the staleness of the evidence be denied.

### C.   Probable Cause

I conclude that Moran's remaining challenges to the validity of the search warrant likewise lack merit. First, Moran argues that the warrant lacked probable cause because there was not a sufficient link between the assault and his residence to warrant a conclusion that evidence relating to the 2006 assault at Spenders Bar would be found inside the residence.

(Docket # 257-1 at ¶ 46).  As discussed at length above, the warrant authorized the search for and seizure of evidence of Moran's membership in or association with the Hell's Angels, not evidence relating to the 2006 assault.  I easily conclude that Preisser's affidavit provided a sufficient link between Moran's residence and the Hell's Angels-related items to support probable cause to believe that such items would be found in his home.

Next, Moran argues that the warrant lacked probable cause justifying the search and seizure of any computers or electronic evidence because the affidavit contained no facts suggesting that a computer would be found in the residence.  (*Id.* at ¶ 52).  I reject this argument because the law does not require the government to identify precisely the form in which records may be maintained.  *See, e.g.*, *United States v. Hunter*, 13 F. Supp. 2d 574, 581 (D. Vt. 1998) (rejecting argument that warrant lacked probable cause because affidavit did not allege that computers would be present in the house; "[a] finding of probable cause is not predicated on the government's knowing precisely how certain records are stored").  Finally, Moran argues that the warrant was invalid because it authorized a search for evidence that the government already possessed, namely, evidence of Moran's membership in the Hell's Angels.  (Docket # 257-1 at ¶ 53).  Moran cites no authority for the proposition that the government may not obtain a warrant to search for evidence of a crime merely because they already have some quantum of evidence of the same type.  I decline to adopt Moran's argument, finding no legal or logical support for it.  Accordingly, I recommend denial of Moran's suppression motion based upon his challenges to the validity of the warrant

## II.     Execution of the Warrant at 15 Algonquin Terrace

Next, I turn to Moran's motion to suppress the evidence seized from 15 Algonquin Terrace[13] on the grounds that the manner in which the warrant was executed amounted to a general search of the premises.  (Docket ## 257-1 at ¶¶ 58, 62; 331 at 6-8).  Moran contends that the application for a warrant to search his residence for evidence of Hell's Angels membership was merely a pretext to allow law enforcement to enter his residence to conduct a general search for any incriminating evidence.  (Docket # 257-1 at ¶ 58).  According to Moran, the use of dogs to search for explosives and narcotics – neither of which was authorized by the warrant – demonstrates that law enforcement did not limit the scope of the search to the terms of the warrant.  (Docket # 331 at 6-7).  Finally, Moran contends that the seizure and search of his computer, and Knight's instructions to WNYRCFL to search the computer for communications between Riedman and Moran, further evidence law enforcement's intent to search beyond the scope of the warrant.  (*Id.* at 8).

The government disagrees that a general search was conducted, noting that no "widespread seizure" of items outside the scope of the warrant occurred and that the subjective intent of the search team is irrelevant.  (*Id.* at 5-8).  The government further contends that the use of the drug and explosive dogs did not constitute a search and that the seizure of the firearms was justified under the plain view doctrine.  (*Id.* at 8, 10-13).

---

[13]  Moran concedes that the seizure of marijuana and a pipe from his person was permissible as a search incident to his arrest.  (Docket # 331 at 5).  Moran does not seek suppression of these items, but reserves the right to challenge their admissibility at trial.  (*Id.* at 5-6).  The government contends that Moran's motion does not seek blanket suppression of all evidence seized from 15 Algonquin Terrace, but instead only seeks suppression of the firearms, ammunition and the computer that were seized.  (Docket # 351 at 6 & n.6).  Having reviewed Moran's submissions, I interpret Moran's arguments to seek blanket suppression.

Having carefully reviewed the record and after further consideration, I conclude that additional briefing concerning the execution of the search warrant in this case would be helpful to the Court.  In reaching this conclusion, I note that after post-hearing briefs were submitted in this case, the Supreme Court issued its opinion in *Florida v. Jardines*, 133 S. Ct. 1409 (2013), which provided, among other things, that "[t]he government's use of trained police dogs to investigate the home and its immediate surroundings is a 'search' within the meaning of the Fourth Amendment."  *Id.* at 1417-18.  In its pre-*Jardines* brief, the government had argued that "[t]he use[s] of drug and explosive dogs by the search team . . . did not, under the circumstances in this case, constitute searches within the meaning of the Fourth Amendment." (Docket # 351 at 8).  Accordingly, by no later than **February 14, 2014**, the parties are directed to file supplemental submissions addressing the following issues:

1. Considering the Supreme Court's decision in *Florida v. Jardines*, 133 S. Ct. 1409 (2013), does the government still maintain that the uses of the dogs did not constitute searches within the meaning of the Fourth Amendment?

   a. Is there any distinction for Fourth Amendment purposes between a drug dog and an explosive dog?

   b. Is there any distinction for Fourth Amendment purposes between the use of the drug dog and the use of the explosives dog based on the facts of this case?

2. Assuming that the dog sniffs constituted searches, were the searches authorized by the search warrant?

3. If not, are there any other legal justifications for the use of the dogs?

   a. If so, what are the justifications and do the justifications apply to the use of both dogs?

   b. Is the evidentiary record sufficiently developed to permit the Court to make a determination as to any potential justification?

33

4.      Assuming that the use of the dogs exceeded the scope of the warrant, is blanket suppression the appropriate remedy?

       a.      What factors should be considered when making this determination?

       b.      May blanket suppression ever be an appropriate remedy if the execution of the warrant did not "effect a widespread seizure of items that were not within the scope of the warrant," *see United States v. Liu*, 239 F.3d 138, 140 (2d Cir. 2000), but otherwise exceeded the scope of the warrant?  If so, under what circumstances?

       c.      Is it relevant that the dogs did not alert?  Is it relevant that three firearms and two suspected marijuana pipes were discovered prior to entry of the dogs?

       d.      Assuming that the good faith of the officers is a factor to be considered, *see United States v. Liu*, 239 F.3d at 140, should it be evaluated under an objective or subjective standard?  *See id.* at 142 ("we do not reach the question of whether the proper approach to 'good faith' in this context is objective or subjective").

       e.      Is the evidentiary record sufficiently developed to permit the Court to make a determination as to the appropriate remedy, if any, to be imposed?

5.      Does *United States v. Leon*, 468 U.S. 897 (1984), apply to the execution of the warrant in this case?

## CONCLUSION

For the reasons stated above, Moran's motion for a bill of particulars **(Docket # 257)** is **DENIED**.  Further, for the reasons stated above, I recommend that the district court deny Moran's motion for a *Franks* hearing and his motion to suppress tangible evidence based upon the validity of the search warrant for 15 Algonquin Terrace.  The parties are directed to file supplemental submissions regarding the execution of the search warrant at 15 Algonquin Terrace

in accordance with the directions provided above by no later than **February 14, 2014**.  Oral

argument on those supplemental submissions shall be held on **February 28, 2014**, at **10:00 a.m.**

**IT IS SO ORDERED**.


                                                    *s/Marian W. Payson*
                                                    MARIAN W. PAYSON
                                                    United States Magistrate Judge


Dated:  Rochester, New York
        January   29  , 2014

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

      **ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

      **ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York.[14]

      The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance.  *See, e.g.*, *Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

      <u>**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.**</u>  *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Ltd.,* 838 F.2d 55 (2d Cir. 1988).

      The parties are reminded that, pursuant to Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York, "[w]ritten objections . . . shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority."  <u>**Failure to comply with the provisions of Rule 59(b) may result in the District Court's refusal to consider the objection.**</u>

      Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the parties.

**IT IS SO ORDERED.**

                                  *s/Marian W. Payson*
                                    MARIAN W. PAYSON
                                United States Magistrate Judge

Dated: Rochester, New York
       January   29  , 2014

---

[14]  Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. § 3161(h)(1)(D) commences with the filing of this Report and Recommendation.  Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the fourteen days allowed for filing objections has elapsed.  *United States v. Andress*, 943 F.2d 622 (6th Cir. 1991); *United States v. Long*, 900 F.2d 1270 (8th Cir. 1990).