UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

            Plaintiff,

       v.

ROBERT W. MORAN,

            Defendant.
_____

REPORT & RECOMMENDATION

11-CR-6083CJS

## PRELIMINARY STATEMENT

On January 29, 2014, this Court issued a Report and Recommendation concerning the pretrial motions filed by defendant Robert Moran, familiarity with which is assumed. (Docket # 467). The Court reserved as to one motion – Moran's motion to suppress evidence seized from his residence on October 24, 2012 on the grounds that the execution of the search violated the Fourth Amendment – pending further briefing and a further evidentiary hearing. (*Id.* at 32-34). The parties have made further submissions addressing the issues identified by the Court, and further evidentiary hearings have been conducted, followed by post-hearing submissions. (Docket ## 488, 494, 499, 514, 520, 559, 562). The issue is now ripe for determination.

The issue before the Court is whether the use of police-trained drug-sniffing and explosives-sniffing dogs exceeded the scope of the warrant and, if so, whether the proper remedy is blanket suppression of all the evidence seized from the premises. No dispute exists that the dog sniffs did not result in the seizure of any evidence. Rather, Moran's argument is that the

evidence demonstrates that the executing agents planned to, and, in accordance with those plans, did use the canines during the search to search for evidence plainly outside the scope of the warrant. Moran contends that the search was thus transformed into a wide-ranging, general search, for which the proper remedy is suppression of all evidence seized from the residence.

## EVIDENTIARY HEARING

A supplemental hearing was conducted on the pending suppression motion, at which the government offered testimony from Greg Kelly ("Kelly") and Kevin Miskell ("Miskell"), officers with the Rochester Police Department, and additional testimony from FBI Special Agent David Knight ("Knight"). (Docket ## 545, 546).

A.  **Testimony of Kelly**

Kelly testified that he had been employed by the Rochester Police Department for the past twenty-nine years. (Tr.A 102).[1] He currently holds the rank of Sergeant and works as the Patrol Supervisor of the canine unit. (*Id.*). In April 2011, he was also responsible for handling a canine, Giro, trained to detect odors of marijuana, cocaine, heroin, methamphetamine and ecstasy. (Tr.A 103-04).

On April 29, 2011, he and Giro were present for a pre-arranged briefing with federal agents prior to the execution of the search warrant for 15 Algonquin Terrace. (Tr.A 104, 112). According to Kelly, "[o]ur role, at the time, was to provide uniform support, and if there was a need for a canine, then we would be called in." (Tr.A 105). After the briefing, he and Giro, along with Miskell and his nitrate-detecting canine, went to the staging area near 15 Algonquin and waited to determine whether their "services . . . [would be] needed." (Tr.A 105, 114). Kelly explained:

---
[1] The transcript of the April 24, 2014 hearing shall be referred to as "Tr.A ___." (Docket # 545).

> Usually on this type of warrant, one always goes with the others, narcotics and guns going to – we're usually sent on those types of situations where they think they may have a need to locate a gun or narcotics, so it's nothing out of the ordinary.

(Tr.A 114-15). Kelly was not told what evidence the warrant authorized the officers to search for and seize. (Tr.A 117).

At some point, Kelly was requested to take his dog Giro through the residence, although he could not remember who had made the request. (Tr.A 106). He recalled that he was advised that marijuana had already been discovered in an upstairs bedroom. (Tr.A 106, 125). He was also told there might be a marijuana "grow room" upstairs. (Tr.A 125). Before he allowed Giro to search, he and Miskell walked through the house and made a visual inspection to ensure that no materials were present that could pose a risk to the dogs. (*Id.*).

Following the walk-through, Kelly put Giro on a lead, brought him into the residence and directed him to search. (Tr.A 107-08). Giro searched the living room, the master bedroom and the attic. (Tr.A 108). Giro alerted in the master bedroom and the attic. (Tr.A 109). In the bedroom, he alerted to a dresser with closed drawers; a quantity of marijuana was visible on top of the dresser. (Tr.A 109, 129). Kelly did not seize anything or open the drawers. (Tr.A 110, 127). Giro also alerted in an empty room on the third floor in which Kelly himself smelled an odor of marijuana, although he did not observe any. (Tr.A 110). Kelly testified that neither he nor Giro moved any objects during Giro's search. (Tr.A 108).

Kelly testified that numerous agents were present in the house executing the warrant when Giro performed his search. (Tr.A 128-29). When he was done with his search, Kelly told Miskell that a gun had been found in the bedroom and he probably would not want to search that room. (Tr.A 137).

B.     **Testimony of Miskell**

Miskell testified that he had been employed with the Rochester Police Department for twenty-nine years. (Tr.A 139). For the past twenty-seven years, he has worked as a canine handler. (*Id.*). On April 29, 2011, he was handling a canine, Nero, trained to detect the odor of nitrates. (*Id.*).

That morning, he attended the briefing prior to the warrant execution at 15 Algonquin Terrace. (Tr.A 140). In describing his role that day, Miskell testified, "If requested, I was to bring my dog into the search for odor of nitrates." (*Id.*). After the briefing, he and Sergeant Kelly waited at the staging area with their canines. (*Id.*). Miskell testified that he "believe[d] that we knew we were going to search the house for [narcotics and explosives]." (Tr.A 148).

Like Kelly, Miskell testified that he could not remember exactly who had asked him to search the residence with Nero, although he recalled that "it would have been from the FBI, I believe." (Tr.A 142). He too was not advised as to what items the warrant authorized the officers to search for and seize. (Tr.A 156). Before bringing Nero inside, he and Kelly walked through the house looking for anything that could be hazardous to their dogs. (*Id.*). He was told that firearms had been located inside the master bedroom. (Tr.A 151).

Miskell testified that he brought Nero inside the house on a lead, and Nero searched the front hallway, the pantry and the garage. (Tr.A 143). Neither Miskell nor Nero moved any objects during the search; Nero did not open any closed spaces or tear anything. (Tr.A 144). At the time of their search, other agents were searching and photographing the residence. (Tr.A 153). Nero did not alert on anything during his search, and nothing was seized

as a result of Nero's search. (Tr.A 145). Miskell estimated that Nero's search lasted approximately twenty minutes. (*Id.*).

    C.    **Testimony of Knight**

Knight testified that, as the team leader for the search at 15 Algonquin Terrace, his responsibilities included ensuring that evidence, before it was seized, was within the scope of the warrant. (Tr.B 161-62).[2] As the search was progressing, he conferred frequently with searching agents to discuss whether or not to seize particular items they had located. (Tr.B 163-64). Knight testified that he was the final authority in determining whether any particular item should be seized. (Tr.B 165). According to Knight, he decided against taking certain items that were duplicative of other evidence seized, even if the duplicative evidence was within the scope of the warrant. (Tr.B 166). He decided not to seize some items because he could not determine that they were within the scope of the warrant, such as a list of phone numbers and an old cell phone. (*Id.*).

During the search, Knight was informed that some equipment had been located in a third floor room that appeared to be a marijuana grow room. (Tr.B 167). Knight went to the attic and decided not to take the equipment because "none of it was relevant." (*Id.*). He further testified that he had been mistaken when he had previously testified that neither dog had alerted during their searches of the house. (*Id.*). Knight testified that he now recalled being informed that the narcotics dog had alerted to a bench in the third floor "grow room." (Tr.B 167-68, 174). According to Knight, another agent implied that they should rip the bench out to look for narcotics, but Knight

> [i]mmediately decided that we were not going to do that because we weren't looking for drugs, and I didn't want to start tearing into

---

[2] The transcript of the May 9, 2014 hearing shall be referred to as "Tr.B ___." (Docket # 546).

    the walls or flooring of the bench to look for something of that
    nature.

(Tr.B 168). According to Knight, the agents seized clothing depicting Hell's Angels' membership or symbols, pins, patches, hats, plaques, photographs, lists, one laptop and some cell phones. (Tr.B 169). The only items seized outside the scope of the warrant were the firearms, marijuana and paraphernalia. (*Id.*).

  Knight testified that no evidence was seized as a result of the canine searches. (Tr.B 170). He further testified that he did not request the canine units to be present at the briefing and does not know who did. (Tr.B 181). He reaffirmed his earlier testimony that he summoned a drug-sniffing dog to search the residence after Moran was found with marijuana and paraphernalia, but does not know who summoned the explosives dog. (Tr.B 169, 184). With respect to his decision to use the narcotics dog, Knight admitted, "In hindsight, it's probably out of the scope of the search." (Tr.B 185). Contrary to the testimony of Kelly and Miskell, Knight testified that the dogs performed their searches before the agents began to execute the warrant. (Tr.B 193, 198-99).

## RELEVANT LAW

  A. <u>Use of Trained Canines</u>

  Last year, the United States Supreme Court made clear that the use of a drug-sniffing dog to search a residence or its curtilage without a warrant constitutes a search within the meaning of the Fourth Amendment. *Florida v. Jardines*, 133 S. Ct. 1409, 1417-18 (2013) ("[t]he government's use of trained police dogs to investigate the home and its immediate surroundings is a 'search' within the meaning of the Fourth Amendment"). In *Jardines*, a law enforcement officer had approached the front porch of the defendant's home with a drug-sniffing

dog and allowed the dog to explore the area around the porch on a six-foot leash. *Id.* at 1413. The dog eventually alerted at the front door and, on the basis of the alert, the officer applied for and obtained a warrant to search the residence. *Id.* Certiorari was limited to the question whether the officers' behavior was a search within the meaning of the Fourth Amendment. *Id.* at 1414.

In answering the question in the affirmative, the Court reasoned that "the officers learned what they learned only by physically intruding on Jardines' property to gather evidence," which "is enough to establish that a search occurred." *Id.* at 1417. As the Court explained, "[i]t is not the dog that is the problem, but the behavior that . . . involved use of the dog[;] [w]e think a typical person would find it a cause for great alarm . . . to find a stranger snooping about his front porch *with or without* a dog." *Id.* at 1416 n.3 (internal quotations omitted).

The Court left open the question of whether the use of the canine at the defendant's home violated his expectation of privacy under *Katz v. United States*, 389 U.S. 347 (1967).[3] *Id.* at 1417. In doing so, the Court acknowledged its previous decisions holding that under certain circumstances the use of a trained narcotics dog does not violate an individual's reasonable expectation of privacy. *Id.* (citing *Illinois v. Caballes*, 543 U.S. at 405 (reasonable expectation of privacy not violated by canine inspection of an automobile during a lawful traffic stop); *United States v. Place*, 462 U.S. 696 (1983) (reasonable expectation of privacy not violated by canine inspection of luggage at airport)). The Court explained that it did not need to

---

[3] Three decades earlier, the Second Circuit had held that a canine sniff at the door of a private residence constituted a search within the meaning of the Fourth Amendment because it violated the occupant's reasonable expectation of privacy. *United States v. Thomas*, 757 F.2d 1359, 1367 (2d Cir.), *cert. denied*, 474 U.S. 819 (1985). The court stated then that "the question always to be asked is whether the use of a trained dog intrudes on a legitimate expectation of privacy." *Id.* at 1366. The court later distinguished, but did not disavow, *Thomas* in holding that an individual "ha[s] no legitimate expectation of privacy in the front yard of his home insofar as the presence of the scent of narcotics in the air was capable of being sniffed by the police canine." *United States v. Hayes*, 551 F.3d 138, 145 (2d Cir. 2008) (citing *Illinois v. Caballes*, 543 U.S. 405, 409-10 (2005)).

reach the question of whether its holding in *Jardines* would be the same under an expectation of privacy analysis because

> [t]he *Katz* reasonable-expectations test has been *added* to, not *substituted* for, the traditional property-based understanding of the Fourth Amendment, and so is unnecessary to consider when the government gains evidence by physically intruding on constitutionally protected areas.

*Id.* (internal quotation omitted).

### B. General Searches and Blanket Suppression

Blanket suppression, a remedy that the Second Circuit has characterized as "drastic" and reserved for "the most extraordinary of cases," is required only when agents "flagrantly disregard" the terms of a warrant (1) by effecting a "widespread seizure of items that were not within the scope of the warrant" and (2) by not acting in "good faith." *United States v. Liu*, 239 F.3d 138, 140, 142 (2d Cir. 2000) (internal quotations omitted), *cert. denied*, 534 U.S. 816 (2001). In ordinary cases, when evidence outside the scope of a warrant is seized, suppression of those items only is the appropriate remedy. *United States v. Matias*, 836 F.2d 744, 747 (2d Cir. 1988). As the Second Circuit explained in *Liu*, "[t]he rationale for blanket suppression is that a search that greatly exceeds the bounds of a warrant and is not conducted in good faith is essentially indistinguishable from a general search." *United States v. Liu*, 239 F.3d at 141. The Court in *Liu* left open the question "whether the proper approach to 'good faith' in this context is objective or subjective." *Id.* at 142.

After the evidentiary hearings in this matter, the Second Circuit answered the question left open in *Liu* in *United States v. Ganias*, 755 F.3d 125, 136 (2d Cir. 2014). There, the Court observed, "[g]overnment agents act in good faith when they perform 'searches conducted in *objectively* reasonable reliance on binding appellate precedent.'" *United States v.*

8

*Ganias*, 755 F.3d at 136 (quoting *Davis v. United States*, 131 S. Ct. 2419, 2423-24 (2011) (emphasis added)).  The government bears the burden of establishing the objective reasonableness of the officers' good faith reliance "on the law at the time of the search." *Id.*  The Second Circuit also made clear in *Ganias* that *Herring v. United States*, 555 U.S. 135, 149 (2009), applies in this context, thus permitting suppression "only where the benefits of deterring the [g]overnment's unlawful actions appreciably outweigh the costs of suppressing the evidence." *Id.* (quoting *Herring v. United States*, 555 U.S. at 141)).

## ANALYSIS

The question of whether a reasonable officer in Agent Knight's position would have had an objectively reasonable belief that the use of the police dogs was lawful is a close one, in my estimation.  Although the dogs and their handlers were present at the pre-search meeting, I reject Moran's contention that the evidence establishes that their use was planned and pre-ordained.  Rather, I credit Knight, who I found to be a very credible witness, that the decision to use the dogs was made only after marijuana and paraphernalia were found on Moran's person and a firearm was found inside the residence.  Of course, whether or not their use was determined in advance does not dispose of the question whether it was lawful.

The reasonable inference from Knight's testimony is that he believed at the time of the search that the law permitted agents executing a valid search warrant to conduct canine searches for drugs and/or explosives if drugs or guns were discovered during the search or on the person of occupants of the property being searched.  Under *Liu* and *Ganias*, the issue is whether such belief was objectively reasonable under the law in existence at the time of the search.

I do not understand the Fourth Amendment to permit such a practice. The Fourth Amendment requires a warrant that particularizes the property to be searched and the items to be seized. *Ganias*, 755 F.3d at 134 ("[t]he Fourth Amendment guards against th[e] practice [of general warrants] by providing that a warrant will issue only if . . . the warrant states with particularity the areas to be searched and the items to be seized" and thus "prevents the seizure of one thing under a warrant describing another") (internal quotation omitted). In this case, the warrant authorized the officers to search Moran's residence for personal property bearing symbols, words or imagery relating to the Hell's Angels. The warrant did not authorize a search for or seizure of drugs or firearms. Neither was the warrant amended, nor did the officers apply to amend the warrant, to include such items once some evidence of this sort was found during the warrant execution. I am not prepared to say that officers executing a warrant authorizing a search for specifically-enumerated non-drug and non-firearms evidence are constitutionally permitted to use canines who are trained and capable of identifying *only* the scent of drugs and firearms any time drugs and/or firearms are discovered during the search for the authorized evidence. *See United States v. Jones*, 2011 WL 294842, *10 (E.D. Wis. 2011) ("[l]et me be clear, however[,] I do not endorse the use of a drug-sniffing dog whenever the police obtain a search warrant listing non-drug-related items"). As the Second Circuit has observed:

> With a trained dog police may obtain information about what is inside a dwelling that they could not derive from the use of their own senses. Consequently, the officers' use of a dog is not a mere improvement of their sense of smell, as ordinary eyeglasses improve vision, but is a significant enhancement accomplished by a different, and far superior, sensory instrument.

*United States v. Thomas*, 757 F.2d at 1367. In my view, the proper procedure under these circumstances, and the one the Constitution demands, is to apply for an amended or second warrant authorizing such a search.

Whether in the pre-*Jardines* era, a reasonable officer could have believed in good faith that the Fourth Amendment allowed otherwise is a difficult question. At the time, as the Court itself acknowledged in *Jardines*, several Supreme Court cases had upheld as constitutional the use of police dogs to conduct property searches, finding that the use of a dog to sniff did not violate an individual's reasonable expectation of privacy. Various lower courts had upheld canine searches on the grounds that because the officers were otherwise lawfully on the premises, the use of trained canines did not violate the privacy of the individual with an interest in the premises. *Peals v. Terre Haute Police Dep't*, 535 F.3d 621, 628 (7th Cir. 2008) ("K-9 units trained to detect contraband do not conduct a search when they sniff in an area where they are lawfully present"); *United States v. Brock*, 417 F.3d 692, 697 (7th Cir. 2005) ("[c]ritical to our holding that the dog sniff in this case was not a Fourth Amendment search is the fact that police were lawfully present inside the common areas of the residence with the consent of [defendant's] roommate[;] . . . [t]he dog sniff from the common area of defendant's residence, where police were present by consent, did not violate defendant's Fourth Amendment rights"). I credit that Knight believed in subjective good faith that because he had a warrant giving him the lawful right to be inside and search the entirety of Moran's residence, he had the lawful right to use trained dogs to sniff for narcotics and explosives because no greater invasion of Moran's privacy would have resulted from the sniffs.[4] *See United States v. Jones*, 2011 WL 294842 at *10 (upholding use of trained narcotics dog during execution for warrant for non-drug evidence after scale and drug-residue were found in plain view; officers acted reasonably where dog use

---

[4] The question of subjective good faith, were that relevant, is an easy one. The record demonstrates that Knight, the case agent in charge of the search, was careful and diligent in determining what items were within the scope of the warrant and should be seized. Most telling, when the narcotics dog alerted to a bench on the third floor, Knight decided not to search the bench because narcotics were not within the scope of the warrant. Any suggestion that the warrant was a pretext to search for drugs is flatly belied by the decision not to search the bench after the alert.

11

did not extend duration of search and sniffed only in areas where items authorized by warrant could have been found, and thus "the presence of the dog did not in any way elevate the level of intrusion"); *cf. Trujillo v. Simer*, 934 F. Supp. 1217, 1223 (D. Colo. 1996) ("[p]laintiffs fail to cite any prior case holding that the Fourth Amendment is violated by bringing a dog sniffing dog into a residence being seized pursuant to an *in rem* arrest warrant[;] . . . [p]laintiffs had no expectation of privacy during the execution of the warrant, so this was not a Fourth Amendment violation").

Whether such a subjective belief could be considered objectively reasonable is made more difficult by *Jardines*, which did not turn on a reasonable expectation of privacy analysis. Rather, it turned on a property-based analysis and held that a canine sniff of a residence is a search within the meaning of the Fourth Amendment. It is black-letter constitutional law that a search of a residence must be authorized by a warrant or otherwise fall within an exception to the warrant requirement. There is no exception to the warrant requirement that allows a law enforcement officer who discovers evidence outside the scope of the warrant during the course of a lawful warrant execution to use search techniques or a search team whose only capability is to discover additional evidence outside the scope of the warrant. *See United States v. Jardines*, 133 S. Ct. at 1418 ("[l]ike the binoculars, a drug-detection dog is a specialized device for discovering objects not in plain view (or plain smell") (Kagan, J., concurring); *United States v. Ewain*, 88 F.3d 689, 695 (9th Cir. 1996) (under objective test, "it no longer matters that the invited-along officer was looking for what he found, which thing was not described in the warrant[;] [w]hat matters is whether the officers looked in places *or in ways* not permitted by the warrant") (emphasis added), *cert. denied*, 519 U.S. 944 (1996). As the Supreme Court has long recognized, the Constitution does not sanction the use of a warrant as a pretext for

a general search. *Horton v. California*, 496 U.S. 128, 140 (1990) ("If the scope of the search exceeds that permitted by the terms of a validly issued warrant or the character of the relevant exception from the warrant requirement, the subsequent seizure is unconstitutional without more").

Resolution of the good faith question is not critical to Moran's suppression motion, however, because the record demonstrates that the agents did not effect a widespread seizure of evidence outside the scope of the warrant. The only evidence seized from Moran's residence that was outside the scope of the warrant was the marijuana and the firearms, and those items were lawfully seized either incident to Moran's arrest or in plain view during the course of the search for Hell's Angels' insignia authorized by the warrant. *See*, *e.g.*, *United States v. Graziano*, 558 F. Supp. 2d 304, 311 (E.D.N.Y. 2008) ("when [executing officers] observed . . . weapons in plain view during . . . search [for other evidence], the officers were authorized to seize them"). In the absence of any widespread seizure, blanket suppression is not justified. *See*, *e.g.*, *United States v. Matias*, 836 F.2d at 748 ("we fail to perceive how these principles are implicated on the present record because there was no widespread seizure of items that were not within the scope of the warrant"); *United States v. Dupree*, 781 F. Supp. 2d 115, 156-57 (S.D.N.Y. 2011) ("even if some of these documents were outside the scope of the warrant, they do not outnumber the documents described in the warrant" and suppression is not justified); *United States v. Graziano*, 558 F. Supp. 2d at 313 ("even assuming *arguendo* that the officers exceeded the bounds of the warrant when they seized the weapons, defendant has failed to show that the search resembled a general search"); *United States v. Triumph Capital Grp., Inc.*, 211 F.R.D. 31, 61 (D. Conn. 2002) ("[t]he search in this case did not actually resemble a general search and there is nothing extraordinary in the facts that justifies blanket suppression"); *United*

States v. Regan, 706 F. Supp. 1102, 1116-17 (S.D.N.Y. 1989) ("even if defendants' allegations are accepted as true, they do not show the kind of egregious, callous, reckless conduct needed to suppress all of the evidence obtained[;] [f]or example, defendants allege that only 69 of the 259 boxes the government seized . . . contained documents relating exclusively to entities entirely outside the scope of the warrant"); *United States v. Schwimmer*, 692 F. Supp. 119, 127 (E.D.N.Y. 1988) ("[w]hile it is true that several items were seized outside of the warrant's terms, I am not persuaded that this calls for the drastic remedy of suppression of the lawfully seized evidence") (internal quotation omitted).  *See also United States v. Uzenski*, 434 F.3d 690, 708 (4th Cir. 2006) ("the officers' seizure of certain items outside the warrant did not transform the particularized search into a general, unrestricted fishing expedition"); *United States v. Hamie*, 165 F.3d 80, 84 (1st Cir. 1999) ("nor did the officers flagrantly disregard the terms of the warrant by seizing a few items beyond its scope[;] [t]he irrelevant evidence was a very small tail on a very large dog").

## CONCLUSION

Accordingly, I recommend to the district court that Moran's suppression motion **(Docket # 257)** be **DENIED**.  Even if the use of the trained canines violated the Fourth Amendment, no evidence was discovered or seized as a result of their use.  Moreover, for the reasons discussed above, blanket suppression of the evidence that was lawfully seized is not warranted.

*s/Marian W. Payson*
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
      December 24, 2014

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York.[5]

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See*, *e.g.*, *Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Ltd.,* 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York, "[w]ritten objections . . . shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 59(b) may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the parties.

**IT IS SO ORDERED.**

*s/Marian W. Payson*
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
       December 24, 2014

---

[5] Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. § 3161(h)(1)(D) commences with the filing of this Report and Recommendation. Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the fourteen days allowed for filing objections has elapsed. *United States v. Andress*, 943 F.2d 622 (6th Cir. 1991); *United States v. Long*, 900 F.2d 1270 (8th Cir. 1990).